MASSACHUSETTS ELECTRIC COMPANY vs. DEPARTMENT OF PUBLIC UTILITIES.

Suffolk. February 5, 1981. — June 3, 1981.

Present: HENNESSEY, C.J., BRAUCHER, WILKINS, & ABRAMS, JJ.

*Public Utilities,* Rate setting, Department of Public Utilities. *Administrative Law,* Adjudicatory proceeding, Decision, Rate setting.

The Department of Public Utilities, acting in the context of an adjudicatory proceeding, could properly dismiss as patently deficient an electric company's rate filing which complied with all applicable statutes and regulations but contravened the department's policy that such a filing be supported by historic test year data rather than future test year data, even though that policy had not been made the subject of a formal rulemaking proceeding, where the department's disapproval of the use of future test year data had been expressed in prior cases, including one involving the same company, and where the company was afforded an opportunity to be heard on the sufficiency of its filing. [678-681]

CIVIL ACTION commenced in the Supreme Judicial Court for the county of Suffolk on April 11, 1980.

The case was reported by *Kaplan, J.*

*Margot Botsford* (*S. Stephen Rosenfeld* with her) for the plaintiff.

*Carl Valvo,* Assistant Attorney General (*Alycia K. Lyons* with him) for the defendant.

HENNESSEY, C.J. The question presented concerns the limits of the power of administrative bodies to establish rules of general application in adjudicatory proceedings. Specifically, the contested proposition is whether the Department of Public Utilities (department) improperly dismissed as patently deficient a rate filing of the Massachusetts Electric Company (company) when the filing complied with all applicable statutes and regulations but contravened

a policy expressed by the department in earlier cases. Although the company, by its counsel, has ably and vigorously presented its views, we find persuasive the reasoning of *Securities & Exch. Comm'n* v. *Chenery Corp.,* 332 U.S. 194 (1947), and therefore we affirm the department's dismissal of the filing.

On February 15, 1980, the company filed with the department schedules of proposed increased retail rates and charges, to take effect on March 1, 1980. Along with the new rate schedules, the company filed prepared testimony and exhibits intended to support the requested increases. The testimony and exhibits consisted of estimates of expenses for the calendar year 1980, adjusted to reflect various changes in operating conditions which the company predicted would occur between September 1, 1980, and August 31, 1981 (the "future test year"[1]). No data were supplied

---

[1] The traditional method used by regulatory bodies to calculate the revenues necessary to produce a reasonable rate of return for utilities is to examine the actual or estimated operating results for a "test year". The "historic test year" approach involves the examination of data from a *completed* twelve-month period — typically the most recent twelve-month period for which complete operating data are known — and uses this period as a frame of reference against which proposed future rates may be tested for their reasonableness. The "future test year," on the other hand, uses as a frame of reference a twelve-month period ending in the future, and the operating data involved in this approach are estimates largely based on computer-generated projections and statistical models.

Each approach has distinct advantages and disadvantages. The historic test year is defended as being based on objectively verifiable information, but since it is based on the assumption that past results approximate the future it may be less reliable in inflationary times or during periods of rapid increase or decrease in demand for service. Supporters of the future test year contend that it is more accurate than the historic test year during periods of economic change, and there are convincing cases and studies demonstrating this capability for accuracy. Because the future test year is based upon complicated data generated by the utility, however, it is both susceptible to bias and difficult to verify. See generally Note: The Use of the Future Test Year in Utility Rate-making, 52 B.U.L. Rev. 791 (1972). We express no opinion concerning the merits of either approach. "Absent constitutional constraints or extremely compelling circumstances the administrative agencies 'should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties.'"

which showed the company's actual expenses and revenues or its realized rate of return for a recently completed twelve-month period (the "historic test year"[2]), adjusted for known and measurable changes. The department docketed the filing as D.P.U. 136, and thereafter suspended the effective date of the new rates until September 1, 1980.

On February 26, 1980, the Attorney General, an intervener in D.P.U. 136, filed a motion to dismiss the company's filing. The principal ground cited for dismissal was the company's use of future test year data, rather than historic test year data, in support of its rate filing, allegedly in contravention of established department precedent. The company filed a written response and memorandum opposing the motion. After a hearing on March 19, 1980, the department dismissed the February 15 filing, finding it to be patently deficient in that it was not supported by historic test year data. The company filed a petition for appeal from the department's decision in the Supreme Judicial Court for Suffolk County on April 11, 1980.[3] On Septem-

---

*Vermont Yankee Nuclear Power Corp.* v. *Natural Resources Defense Council, Inc.,* 435 U.S. 519, 543 (1978).

[2] See note 1, *supra.*

[3] As a preliminary matter, the Attorney General argues that the order dismissing the filing, with leave to refile, is not appealable as a final order because the company subsequently submitted another filing containing both historic and future test year data rather than standing upon its original filing. This new filing was docketed by the department as D.P.U. 200. We observe that the department may suspend proposed rates for a maximum of six months, G. L. c. 25, § 18, and did in fact suspend the rates proposed in D.P.U. 136 for six months, and that there is no limitation upon how frequently the company may submit rate filings. When D.P.U. 200 was filed by the company approximately one month later, the department suspended the proposed rates (rates altogether different from those proposed in D.P.U. 136) for a full six-month period rather than for the remaining five months yet to run in D.P.U. 136, and in other ways implicitly accepted the separateness of the new filing. We conclude that the second filing, D.P.U. 200, was a distinct filing and not a continuation of D.P.U. 136, and that the company's right to appeal from the dismissal of D.P.U. 136 is not impinged upon by its filing of D.P.U. 200. Cf. *New York Tel. Co.* v. *Public Serv. Comm'n,* 59 App. Div. 2d 17, 19-20 (N.Y. 1977) (where commission improperly dismissed an initial

ber 12, 1980, a single justice of this court reserved and reported the appeal to the full court.

At the heart of the dispute is the distinction between the powers of a regulatory body to establish administrative policy through either formal rulemaking or ad hoc adjudicatory proceedings. While the company concedes that "[i]t is a recognized tenet of administrative law that an agency can adopt policy decisions in the context of adjudicatory proceedings," it qualifies this by urging that "[a]n automatic application of a policy or 'rule' articulated in previous adjudicatory decisions without investigation of the specific facts put at issue obliterates the essential difference between adjudication and rulemaking and cannot be sustained." It is clear that the department has the power to promulgate regulations requiring that all filings be accompanied by historic test year data. See *Cambridge Elec. Light Co.* v. *Department of Pub. Utils.*, 363 Mass. 474, 493-496 (1973). We note, too, that the department has previously expressed, in adjudicatory proceedings involving this company, its disapproval of future test year data. *Massachusetts Elec. Co.*, 12 P.U.R. 4th 65, 67 (Mass. D.P.U. 1975) ("The chance of bias in the evidence and the difficulty of testing such testimony objectively are simply too great to assure reliable results. It has long been sound regulatory practice to fix rates of public utility companies on the basis of a past test year, adjusted for changes occurring within a reasonable time after the end of that period. An approach so consistently used should not be lightly overturned. . . . [T]he department continues to follow it as a matter of sound regulatory practice based on established precedent"). The only circumstances which might force the department to accept filings which lack historic test year data are inadequate adjudicatory precedent — a circumstance refuted by *Massachusetts Electric, supra* — or by the failure of the department to utilize its rulemaking powers.

---

filing with leave to make a revised filing after thirty days, statutory ten-month suspension period ran from initial filing date).

We think that in the circumstances presented in this case, the department could act by either adjudication or rulemaking. "[T]he choice made between proceeding by general rule or by individual, ad hoc litigation is one that lies primarily in the informed discretion of the administrative agency." *Securities & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 203 (1947). "To insist upon one form of action to the exclusion of the other is to exalt form over necessity." *Id.* at 202. This is not to say that the choice lies in the *exclusive* discretion of the administrative body. Every administrative adjudication which involves the application of a new standard of conduct has a retroactive effect and must therefore be subject to judicial scrutiny. We indorse the proposition put forth in *Chenery* that the prudent administrative body, being mindful of the scrutiny given to rules of general application established in ad hoc adjudication, should proceed by rulemaking where possible and practical. *Id.* However, when the administrative agency does choose adjudication over rulemaking, judicial review must balance the adverse effects of retroactivity "against the mischief of producing a result which is contrary to a statutory design or to legal and equitable principles. If that mischief is greater than the ill effect of the retroactive application of a new standard, it is not the type of retroactivity which is condemned by law." *Chenery, supra* at 203. Cf. *Arthurs v. Board of Registration in Medicine, ante* 299, 312-313 (1981).

If we accepted the company's view that the department must here be confined to rulemaking, then in the absence of a valid regulation the department would be bound to conduct a full evidentiary hearing on any rate filing, no matter how facially defective or inadequate, no matter how contrary to well-known past practice, and no matter how burdensome on all other parties it might be. More importantly, the department would be forced to anticipate each of the myriad defects a rate filing might present and to establish regulations applicable outside of the contexts in which the problem might arise. This alone is sufficiently

impractical to outweigh the adverse impact of retroactive application, at least where, as here, the department is working within a detailed, organized system of precedent which clearly established the necessity for the omitted data. The company's view of the circumstances under which the department might dismiss a filing at the threshold is too limited and impractical and, far from improving the administrative process, would effectively remove a useful tool in attacking delay and promoting efficiency in the administrative process. See Gellhorn & Robinson, Summary Judgment in Administrative Adjudication, 84 Harv. L. Rev. 612 (1971).

In this case, it is beyond dispute that the department had a well-established policy with respect to historical test year data. See *Massachusetts Elec. Co.*, 12 P.U.R. 4th 65, 67-69 (Mass. D.P.U. 1975); *New England Tel. & Tel. Co.*, 11 P.U.R. 4th 297, 298-300 (Mass. D.P.U. 1975). It is not disputed that the company failed to include historic test year data in its rate filing. These were the only material facts necessary for the department to conclude that the company's application was deficient on its face and should be dismissed. The company was afforded an opportunity to be heard on the sufficiency of its filing and to rebut the adverse claims of the Attorney General. The department issued a written opinion detailing the deficiency in the filing and stating its reasons for requiring historic test year data. These procedures afforded the company all the rights to which it was entitled. See *FPC* v. *Texaco, Inc.*, 377 U.S. 33 (1964); *Tennessee Gas Pipeline Co.* v. *FPC*, 561 F.2d 955, 958 (D.C. Cir. 1977). We conclude that the slight burden borne by the first party on whom this newly-applied but not newly-announced standard was imposed is outweighed by the avoidance of delay and the promotion of administrative efficiency resulting therefrom. See *Chenery, supra* at 203.

We do not intend to preclude a utility from presenting proof and argument intended to support its contention that there are unique and exceptional reasons why a policy

should not be applied to it.  See *Southbridge Water Supply Co.* v. *Department of Pub. Utils.*, 368 Mass. 300 (1975). This the company was allowed to do.  Neither do we wish to foreclose a utility from urging in other ways a change in methodology upon the department.  So long as the foregoing opportunities are provided, however, we hold that where the department chooses to establish policy by adjudication, it may dismiss a filing as patently defective if (1) the policy to be enforced has been expressed by the department in earlier cases, (2) the furtherance of that policy lies within the department's powers, and (3) the dismissal does not run afoul of the *Chenery* balancing test.

The decision of the department is affirmed.

*So ordered.*