372                                              387 Mass. 372

Brookline *v.* Commissioner of the Department of Environmental Quality Engineering.

TOWN OF BROOKLINE & another[1] *vs.* COMMISSIONER OF THE
DEPARTMENT OF ENVIRONMENTAL QUALITY ENGINEERING
& others[2]
(and two companion cases[3]).

Suffolk. May 5, 1982. — September 3, 1982.

Present: HENNESSEY, C.J., LIACOS, NOLAN, & O'CONNOR, JJ.

*Due Process of Law,* Vagueness of regulation. *Administrative Law,* Reg-
ulation, Adjudicatory proceeding, Rehearing, Evidence, Decision.
*Environment,* Air pollution. *Statute,* Construction.

There was no merit in a contention of impermissible vagueness in certain
air quality standards for the emission of air contaminants set forth in
310 Code Mass. Regs. 7.01 (1979), to be applied by the Department of
Environmental Quality Engineering in deciding whether to approve a
plan for the construction of an energy facility. [376-379]
The Department of Environmental Quality Engineering did not abuse its
discretion by formulating an acceptable air quality standard for the
emission of quantities of nitric oxide to be met by a proposed energy
facility in an adjudicatory hearing rather than by a formal rulemaking
procedure. [379-380]
An order of the Department of Environmental Quality Engineering plac-
ing certain limitations on the emission of quantities of nitric oxide from
diesel generators in a proposed energy facility did not violate G. L.
c. 111, § 142D, merely because such limitations were more strict than
existing Federal standards. [381-382]
A failure by the Department of Environmental Quality Engineering to
consider evidence or to make findings on certain supposedly carcino-
genic substances contained in the exhaust which would be emitted
from a proposed energy facility, although the issue had been raised in
a timely fashion by opponents to the plant's construction, required

[1] Brookline Citizens to Protect the Environment.

[2] The Deputy Commissioner of the Department of Environmental
Quality Engineering, the Secretary of the Executive Office of Environ-
mental Affairs, and the Medical Area Total Energy Plant, Inc. (MATEP).

[3] Medical Area Total Energy Plant, Inc. *vs.* Department of Environ-
mental Quality Engineering & others. Michael Lambert *vs.* Department
of Environmental Quality Engineering; Medical Area Total Energy
Plant, Inc., intervener.

387 Mass. 372    373

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

that the matter be remanded to the Department to hold hearings on the possible adverse health effects of the various carcinogenic materials. [383-384]

In the circumstances, the opponents of the construction of an energy facility were not denied their due process rights by the refusal of the Department of Environmental Quality Engineering to grant a rehearing on the issues whether certain air quality guidelines established by the Department were adequate to protect the public health and whether a revised plan formulated by the operators of the proposed facility met those guidelines. [384-386]

The Department of Environmental Quality Engineering neither abused its discretion by determining that, for purposes of the proposed operation of an energy facility, an 81% conversion of oxides of nitrogen to the pollutant nitrogen dioxide would be utilized in determining the effect of the plant on air quality, nor shifted to the plant's opponents the burden of proof as to the hazardous character of the facility, where the 81% figure was supported by substantial evidence and the opponents were merely invited to offer any evidence rebutting the evidence supporting the 81% figure. [386-387]

Certain findings and guidelines made by the Department of Environmental Quality Engineering respecting emissions from a proposed energy facility and their effect on public health at numerous relatively small, high trafficked locations in the vicinity of the plant were supported by substantial evidence and were neither arbitrary nor capricious. [387-392]

The due process rights of the opponents of the construction of a cogeneration energy facility were not violated by the failure of the Department of Environmental Quality Engineering to require a tentative decision prior to issuing its final decision where the decisionmaker officiated jointly at the hearing with the person designated as hearing officer. [392-393]

CIVIL ACTIONS commenced in the Superior Court Department, two on June 26, 1980, and one on December 26, 1980.

The cases were reported to the Appeals Court by *Zobel, J.* The Supreme Judicial Court granted requests for direct review.

*Robert W. Meserve & Verne W. Vance, Jr.,* for Medical Area Total Energy Plant, Inc.

*Thomas B. Bracken* for the town of Brookline & another.

*Michael Lambert* pro se.

*Carl F. Dierker (Stephen M. Leonard,* Assistant Attorney General, with him) for Commissioner of the Department of Environmental Quality Engineering.

NOLAN, J. These consolidated cases involve appeals from several decisions of the Department of Environmental Quality Engineering (DEQE) pursuant to G. L. c. 30A, § 14. The decision of November 30, 1979, approved construction of that portion of a plan submitted by Medical Area Total Energy Plant, Inc. (MATEP), involving production of steam and chilled water in the Mission Hill area of Boston bordering the town of Brookline. The decision of May 27, 1980, disapproved construction of the other portion of the MATEP facility, involving production of electricity by six diesel engine generators. The decision of November 24, 1980, approved the diesel portion of the facility, subject to certain conditions. The town of Brookline and a group of residents of Brookline (Brookline opponents), and Michael Lambert (Mission Hill opponent)[4] challenge the DEQE decisions in so far as they approve construction of the facility. MATEP challenges the legality of certain limitations on emissions from the diesel portion of the plant, as well as certain conditions on operation of the facility.

Petitions for judicial review were filed in the Superior Court, consolidated, and reported to the Appeals Court pursuant to Mass. R. Civ. P. 64, 365 Mass. 831 (1974).[5] We granted the parties' application for direct appellate review.

*Facts.* MATEP submitted, in January, 1977, an application to the DEQE for required preconstruction approval of its plan to build a cogeneration energy facility in the Mission Hill area. See 310 Code Mass. Regs. 7.02 (2) (1979). The plant would provide steam, chilled water, and electricity for hospitals, educational and research institutions, and the

---

[4] The Brookline opponents and Mission Hill opponent will be collectively referred to as "opponents" in this opinion.

[5] The Superior Court judge reported the case without making findings. In his order he observed that the DEQE findings were sufficient to report a case where the judge was viewing only the written record but was "uncertain, as a matter of law, which party ought to prevail." No party challenges the report of the case. In such circumstances, and without deciding the propriety of a report such as this if it were challenged by a party, we reach the merits.

Mission Park housing complex largely by means of power produced by six diesel engine generators.

It is principally the emissions and effects of the emissions from the diesel portion of the facility which are the subjects of this appeal. The diesels will emit quantities of oxides of nitrogen ($NO_x$). The most common oxide emitted will be nitric oxide (NO). The NO will rise in the atmosphere and combine with ozone to produce nitrogen dioxide ($NO_2$). The $NO_2$, a harmful pollutant, will return to the earth's surface. On January 31, 1978, the diesel portion of the facility was disapproved because it would have resulted in higher $NO_2$ levels than the DEQE then thought allowable to protect the public health.[6]

The Brookline opponents requested an adjudicatory hearing on the decision approving the steam/chilled water portion of the facility. MATEP requested an adjudicatory hearing on that part of the decision disapproving the diesel portion of the plant. The requests for adjudicatory hearings were granted, and the hearings were combined. Michael Lambert and several local groups (the Mission Hill interveners) were granted leave to intervene.[7]

The hearing began in late 1978 and continued for over twenty-three days. The hearing officer, Ellyn Weiss, issued a tentative decision. After considering comments on Weiss's decision, the DEQE, through Deputy Commissioner David Fierra, issued a final decision on November 30, 1979, approving the steam/chilled water portion of the facility and disapproving the diesel portion. In that segment of the decision disapproving the diesel portion of the facility, Fierra

---

[6] The DEQE found that the Federal ambient air standard, which is an annual average of 100 micrograms of $NO_2$ per cubic meter of air (100 ug/m³), was inadequate to protect public health. Instead, the DEQE found that $NO_2$ levels in excess of 200 ug/m³ (micrograms per cubic meter) on an hourly basis would adversely affect public health. The DEQE found, further, that the predicted MATEP impacts would cause ambient $NO_2$ levels to exceed that level.

[7] Upon motion by the DEQE, all the Mission Hill interveners except Michael Lambert were subsequently dismissed as plaintiffs in the Superior Court proceedings.

found that ambient $NO_2$ levels above 320 ug/$m^3$[8] on an hourly basis would be potentially injurious to public health, and that the MATEP facility would result in $NO_2$ concentrations above that level. Fierra provided guidelines for modifying MATEP's diesel operating plan in order for it to secure approval.

In January, 1980, MATEP submitted a revised plan. Although most aspects of this plan were approved, the diesel portion was again disapproved because the DEQE found that it had insufficient data to determine whether the plan would violate the guidelines with respect to some heavily trafficked areas ("hot spots").

On petition of MATEP, the DEQE held a hearing on the "hot spot" issue, which was presided over by both Weiss and Fierra. Following the hearing, on November 24, 1980, the DEQE issued a decision approving the diesel portion subject to certain conditions.

In addition to $NO_x$, the diesel portion of the MATEP facility will emit quantities of particulates which include some particles of substances that are thought to be carcinogenic or mutagenic (polycyclic aromatic hydrocarbons [PAH], polynuclear organic matter [POM], and trace metals). The DEQE, for reasons described later in this opinion, declined to make findings on the issues raised by the potentially carcinogenic and mutagenic emissions.

Before us are appeals in which the DEQE is defending its decision, MATEP is arguing for fewer controls, and the opponents are arguing for greater controls. For reasons appearing below, we are remanding the case to the DEQE for hearings on the carcinogen and mutagen issue, and affirming all other portions of its decision.

*MATEP's Challenge.*

1. *Vagueness of regulation.* MATEP's first attack on the DEQE decision is that the regulation on which the decision is based, 310 Code Mass. Regs. 7.01 (1979), is so vague that it failed to give fair warning as to what the standards for the

---

[8] Micrograms per cubic meter.

387 Mass. 372                                      377

Brookline *v.* Commissioner of the Department of Environmental Quality Engineering.

DEQE decision would be.[9]  Such an allegation, if true, would be violative of MATEP's due process rights.  *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497-498 (1982).  *Grayned* v. *Rockford*, 408 U.S. 104, 108 (1972).  *Board of Appeals of Hanover* v. *Housing Appeals Comm.*, 363 Mass. 339, 363 (1973).

The regulation in question states:  "No person owning, leasing, or controlling the operation of any air contamination source shall willfully, negligently, or through failure to provide necessary equipment or to take necessary precautions, permit any emission from said air contamination source or sources of such quantities of air contaminants which will cause, by themselves or in conjunction with other air contaminants, a condition of air pollution."  310 Code Mass. Regs. 7.01 (1979).  "Air pollution" is defined in the regulations as the presence of air contaminants which would:  "a. cause a nuisance; b. be injurious, or be on the basis of current information, potentially injurious to human or animal life, to vegetation, or to property; or c. unreasonably interfere with the comfortable enjoyment of life and property or the conduct of business."  310 Code Mass. Regs. 7.00 Definitions (1979).

MATEP contends that the above regulatory language impermissibly fails to give fair notice of what levels of emissions will be tolerated.  MATEP argues that so much administrative discretion is placed in the DEQE by the regulation that MATEP had no way of knowing during the design phase of the project whether, in the opinion of the agency, emissions from the diesels would "unreasonably interfere with the comfortable enjoyment of life."  To buttress its argument, MATEP points to the variance in the levels of $NO_2$ that the DEQE was willing to accept during the years of hearings on the project.  In 1977, the DEQE, before public hearings, proposed to accept a $NO_2$ one-hour exposure

---

[9] DEQE withheld approval of MATEP's original plan for the diesel facility because it found that emissions of $NO_x$ from the plant would result in $NO_x$ levels which would endanger public health in violation of 310 Code Mass. Regs. 7.01 (1979).

limit of 480 ug/m$^3$. In 1978, the DEQE disapproved a MATEP design because it could not meet an exposure limit of 200 ug/m$^3$. In 1979, the DEQE again disapproved a MATEP design on the ground that the one-hour $NO_2$ limit needed to protect public health is 320 ug/m$^3$. Thus, continues MATEP, not only was the regulation vague prior to hearings, but the DEQE further provided no clear legal standard during the hearings.

We note first that the regulation of business and economic activity is subject to a vagueness test less strict than that applied to most criminal behavior. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc., supra. Papachristou* v. *Jacksonville,* 405 U.S. 156, 162 (1972). *Commonwealth* v. *Gustafsson,* 370 Mass. 181, 187 (1976). The circumstances of this case demonstrate why rules governing commercial conduct need not be drawn with undue precision. With the incessant advance of science, it would be unreasonable to ask the DEQE to define specifically and mathematically in a rule the limits each emission may reach. Rather, "the practical necessities of discharging the business of government inevitably limit the specificity with which [a regulatory agency] can spell out prohibitions." *Boyce Motor Lines, Inc.* v. *United States,* 342 U.S. 337, 340 (1952). Cf. *Commonwealth* v. *Orlando,* 371 Mass. 732, 735 (1977). See also *Burnham* v. *Board of Appeals of Gloucester,* 333 Mass. 114, 118 (1955) ("The degree of certainty with which standards for the exercise of discretion are set up must necessarily depend on the subject matter and the circumstances").

A vague rule subjects people to an unascertainable standard. *Coates* v. *Cincinnati,* 402 U.S. 611, 614 (1971). The standard promulgated by the DEQE in this case was not, however, unascertainable. Rather, during the course of the administrative hearings a definite limit to $NO_2$ levels was mandated. Ambiguities, especially in regulations affecting business, may be clarified by resort to the administrative process so as to cure a vagueness claim. *Hoffman Estates* v. *Flipside, Hoffman Estates, Inc., supra. Joseph E. Seagram & Sons* v. *Hostetter,* 384 U.S. 35, 49 (1966).

What may be injurious to life or interfere with the comfortable enjoyment of life is best left to the DEQE to determine on a case-by-case basis in light of the most current scientific evidence. The standards set forth in 310 Code Mass. Regs. 7.01 (1979), especially in light of the fact that they regulate future conduct and do not punish past transgressions, are sufficiently definite to withstand a challenge that they violate the due process clause of the United States Constitution. The purpose and objectives of 310 Code Mass. Regs. 7.01 (1979) and the statute that gave the DEQE power to promulgate that regulation, G. L. c. 111, § 142A, provide sufficient guidance to the DEQE and to those whom the DEQE regulates. In this time of rapid scientific change, we do not think that mathematical precision in 310 Code Mass. Regs. 7.01 (1979) is required or even possible.

2. *$NO_2$ standard derived in adjudicatory proceeding.* MATEP's second attack on the DEQE decision is an assertion that the DEQE abused its discretion by formulating an acceptable $NO_2$ level for the MATEP project in an adjudicatory hearing rather than by a formal rulemaking procedure. We disagree.

Like any administrative agency, the DEQE may, at its discretion, announce and apply new rules and standards in an adjudicatory proceeding. *SEC v. Chenery Corp.*, 332 U.S. 194, 202-204 (1947). "[T]he choice made between proceeding by general rule or by individual, *ad hoc* litigation is one that lies primarily in the informed discretion of the administrative agency." *Id.* at 203. *Massachusetts Elec. Co. v. Department of Pub. Utils.*, 383 Mass. 675, 679 (1981). *Arthurs v. Board of Registration in Medicine*, 383 Mass. 299, 312-313 (1981). We recognize, of course, that the application of new principles or standards announced in a decision may be so unfair as to amount to an abuse of discretion. Cf. *NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974); *SEC v. Chenery Corp.*, *supra* at 203-204. We find no abuse of discretion here.

MATEP had myriad opportunities to introduce evidence on the $NO_2$ issue. Furthermore, in the rapidly evolving field

of environmental science, it seems that the only effective manner in which the DEQE could have reached a result consistent with the statutory mandate to prevent air pollution was by announcing the $NO_2$ standards that it would apply to MATEP through an adjudicatory hearing.[10] We do not expect an agency like the DEQE to perceive all environmental evils in time sufficient to promulgate rules concerning them.[11] We defer to the DEQE's determination, in this instance, that a case-by-case process best serves its purpose.[12]

---

[10] We note that it was especially appropriate for the DEQE to develop, in an adjudicatory hearing, a standard of $NO_2$ levels to which MATEP must submit. At one point in the hearing process, MATEP claimed that, if a new rule concerning such $NO_2$ levels was promulgated, it could not be applied retroactively to MATEP. If MATEP's argument is correct, and we do not pass on the point, the only manner in which the DEQE could protect the environment from excessive $NO_2$ levels was by a standard developed in an adjudicatory hearing.

[11] See *SEC* v. *Chenery Corp.*, 332 U.S. 194, 202-203 (1947), where the Court stated: "[P]roblems may arise in a case which the administrative agency could not reasonably foresee, problems which must be solved despite the absence of a relevant general rule. . . . In those situations, the agency must retain power to deal with the problems on a case-to-case basis if the administrative process is to be effective."

[12] MATEP relies on two Ninth Circuit cases to support its view. In the first, *Patel* v. *Immigration & Naturalization Serv.*, 638 F.2d 1199, 1204 (9th Cir. 1980), the court stated: "Under the authority of [*NLRB* v. *Wyman-Gordon Co.*, 394 U.S. 759 (1969)], we conclude that if the INS wished to add [a requirement to a regulation], it should have done so in a rulemaking procedure. See 2 Davis, Administrative Law Treatise § 7:25 at 124 (1979)." Professor Davis, in his 1982 supplement to the treatise, commented that "[n]either the *Wyman-Gordon* case nor the Treatise supports that conclusion; both were limited to the subject of using an adjudication for making *a rule not applied in the adjudication,* and that is quite a different subject" (emphasis in original). K.C. Davis, Administrative Law § 7:25, at 180 (Supp. 1982). See also *Mehta* v. *Immigration & Naturalization Serv.*, 574 F.2d 701, 705 (2d Cir. 1978); *Heitland* v. *Immigration & Naturalization Serv.*, 551 F.2d 495 (2d Cir.), cert. denied, 434 U.S. 819 (1977).

The other case that MATEP cites is *Ford Motor Co.* v. *FTC*, 654 F.2d 599 (9th Cir. 1981), in which the court held that an agency seeking to establish rules of widespread application must proceed by rulemaking rather than adjudication. Since this opinion was withdrawn from the bound volume of the Federal Reporter because rehearing is pending, we cannot examine it and it thus can bear no weight in our decision. Furthermore, while persuasive policy arguments may be made that important

387 Mass. 372                                          381

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

3. *Does the DEQE order violate G. L. c. 111, § 142D?*
MATEP's final attack on the DEQE order is an argument
that the $NO_2$ standard applied, in being stricter than Feder-
al standards, violates G. L. c. 111, § 142D, as amended by
St. 1974, c. 494, § 1. In pertinent part, § 142D states:
"From time to time the department shall review the ambi-
ent air quality standards and plan for implementation,
maintenance and attainment of such standards adopted
pursuant to this section and, after public hearings, shall
amend such standards and implementation plan so as to
minimize the economic cost of such standards and plan for
implementation, provided, however, that such standards
shall not be less than the minimum federal standards. The
initial such amendments to such standards and implementa-
tion plan shall postpone the achievement dates for the pri-
mary and secondary ambient air quality standards to the
latest dates permitted pursuant to federal law." MATEP
reads § 142D as mandating that the DEQE must adhere to
Federal air quality standards and view those standards as
both the floor and ceiling for the Commonwealth's stand-

changes in the law are better made through rulemaking and not through
adjudication, see *SEC* v. *Chenery Corp., supra* at 202 ("filling in the in-
terstices of [a statute] should be performed, as much as possible, through
this quasi-legislative promulgation of rules"); *Massachusetts Elec. Co.* v.
*Department of Pub. Utils.,* 383 Mass. 675, 679 (1981), we think it con-
structive to quote Professor Davis's analysis of *Ford Motor Co.* v. *FTC,*
*supra.* "On the legal background, the court's main proposition that 'an
agency must proceed by rulemaking if it seeks to change the law and
establish rules of widespread application,' 654 F.2d at 601, is truly spec-
tacular, because (a) no previous law supports it, (b) both courts and agen-
cies have at all stages of their development changed law through adjudi-
cation even when such law is of widespread application, and (c) the prop-
osition is directly contrary to two prominent Supreme Court holdings.
When the SEC made new law in an adjudication, the Court upheld it,
stating that 'the choice made between proceeding by general rule or by in-
dividual, *ad hoc* litigation is one that lies primarily in the informed discre-
tion of the administrative agency.' *SEC* v. *Chenery Corp.,* 332 U.S. 194,
203 (1947). And the Court has held that the NLRB 'is not precluded from
announcing new principles in the adjudicative proceeding and that the
choice between rulemaking and adjudication lies in the first instance
within the Board's discretion.' *NLRB* v. *Bell Aerospace Co.,* 416 U.S.
267, 294 (1974)." K.C. Davis, Administrative Law § 7:25, at 181-182
(Supp. 1982).

382                                                387 Mass. 372

Brookline v. Commissioner of the Department of Environmental Quality Engineering.

ards. Briefly, MATEP reasons that St. 1974, c. 494, was enacted as emergency legislation "to bring immediate economic relief to the consumers of the commonwealth from the spiraling costs of energy and other products due to the high cost of fuels." Preamble to St. 1974, c. 494. Any standards stricter than Federal standards would increase the cost of producing energy, the argument continues, so that the Federal standards may not be exceeded by the DEQE.

We do not agree with MATEP. If we were to construe c. 494 as MATEP urges, significant portions of the statute would be rendered meaningless. "Where it is possible, . . . a statute should be construed so as to avoid rendering words in that statute meaningless." *A Juvenile, petitioner,* 364 Mass. 531, 536 (1974). We think that the Legislature would not have mandated periodic review of ambient air standards if it wanted those standards to be identical to Federal standards. Under MATEP's construction of the statute, there would be no need for review.

Rather, we read the language "minimize the economic cost of such standards" in light of the over-all statutory mosaic. See *Pereira* v. *New England LNG Co.,* 364 Mass. 109, 115 (1973). The principal concern of the statutory scheme is to control air pollution. G. L. c. 111, § 142B. Accordingly, the DEQE must "prevent pollution or undue contamination of the atmosphere." G. L. c. 111, § 142B, second par., inserted by St. 1960, c. 676, § 1. The legislative admonition to minimize costs thus means that the DEQE must protect the environment at the lowest possible cost to consumers consistent with such protection. If the DEQE determines that certain standards are necessary to prevent pollution, it must prescribe those standards even if they are higher than those set by the Federal government. We read § 142D along with § 142B so that the entire legislative program will constitute a consistent and harmonious whole. See *Registrar of Motor Vehicles* v. *Board of Appeal on Motor Vehicle Liab. Policies & Bonds,* 382 Mass. 580, 585 (1981); *Jones* v. *Wayland,* 380 Mass. 110, 118 (1980). MATEP's statutory argument is without merit.

387 Mass. 372                                                    383

Brookline *v.* Commissioner of the Department of Environmental Quality Engineering.

*Opponents' Challenge.*

1. *Carcinogens.* The opponents' first attack on the DEQE order involves the failure by the DEQE to consider evidence or to make findings on certain supposedly carcinogenic substances.[13] In brief, the hearing officer found that the issues regarding the possible carcinogenic effects of these substances were not raised in a timely fashion and that, therefore, they were not properly within the purview of the proceedings before her. We disagree with the hearing officer's conclusion, which was subsequently adopted by the deputy commissioner in his final decision of November 30, 1979, and therefore we remand this matter to the DEQE to hold hearings on the possible adverse health effects of various carcinogenic materials in MATEP's diesel exhaust.

A brief review of the sequence of events in this case will explain our remand. MATEP filed its application with the DEQE for approval of its proposed facility on January 24, 1977. On January 31, 1978, the DEQE denied approval of the diesel portion of the project. On February 10, 1978, MATEP requested an adjudicatory hearing with respect to the DEQE decision. The opponents, and others, filed petitions to intervene which were granted as to the opponents. All parties were given until August 28, 1978, to file specifications of issues and lists of witnesses.

In their memorandum regarding issues and witnesses, the Brookline opponents included Dr. William Balgord and stated that his testimony would be "on the interactions of $NO_2$ and particulate emissions from the MATEP diesels, and the potential carcinogenic effects of these emissions from the MATEP plant." Mr. Lambert, the Mission Hill opponent, raised an issue in his memorandum in the following way: "What studies conclusively show that diesel emissions, as opposed to $NO_x$ or $NO_2$, in these qualities [*sic*] are not injurious to the public health and welfare of populations

---

[13] Those substances have been identified as including polycyclic aromatic hydrocarbons (PAH), polynuclear organic matter (POM), and trace metals and their derivatives.

highly susceptible to health impacts?" On August 30, 1978, the hearing officer gave Mr. Lambert until September 11 to make specific allegations concerning emissions other than $NO_x$ from the diesels. In his memorandum of September 11, Mr. Lambert specified, among other diesel emissions, POM, PAH, trace elements such as selenium, arsenic, chromium, vanadium, other metals, and "[k]nown and yet unknown carcinogens, teratogens, and mutagens." Also on September 11, counsel for the Brookline opponents wrote a letter to the hearing officer specifying, among others, PAH, POM, and trace metals and their derivatives as pollutants which would be at issue in the MATEP hearing.

While it is true that the matter of carcinogens was not mentioned in the opponents' petitions to intervene, that is not dispositive of this issue. Rather, we look to the specifications of issues, modified, at least with respect to Mr. Lambert, by the September 11 memorandum. We hold that Mr. Lambert's list of possible carcinogens identified those substances as issues before the DEQE, especially as the Brookline opponents also manifested concern with potential carcinogens. This court would not lightly overturn an administrative agency's finding of fact, but we are convinced, from a close reading of the record, that the issue of carcinogens was properly before the DEQE.[14]

2. *Rehearings.* The opponents' next attack on the DEQE decision involves an alleged denial of their due process rights by the agency's refusal to grant a rehearing on the issues of (1) whether the guidelines in the final decision dated November 30, 1979, were adequate to protect the public health, and (2) whether MATEP's revised 1980 diesel plan met those guidelines.

The opponents argue that the guidelines announced went far beyond the scope of evidence introduced in the adjudica-

---

[14] Because we are remanding for hearings on this issue, we need not decide whether the DEQE improperly relied on extra-record materials with respect to potential carcinogens. Absent a record on this issue, we also decline to rule on any testing procedures which the DEQE may prescribe with respect to carcinogens.

387 Mass. 372                                                385

Brookline *v*. Commissioner of the Department of Environmental Quality Engineering.

tory hearing. Further, they contend that the 1980 diesel plan alters potential emissions from the plant to such an extent that new hearings are necessary to determine their impact. We disagree with both these contentions.

We note, initially, that the granting of a rehearing is discretionary with the agency. 310 Code Mass. Regs. 1.01 (10)(o) & (p) (1979). Cf. *ICC* v. *Jersey City*, 322 U.S. 503, 514-515 (1944); *RSR Corp.* v. *FTC*, 656 F.2d 718, 721 (D.C. Cir. 1981). When the issues and facts have been argued at length in adjudicatory hearings, and when the agency has made a reasoned record describing why rehearing was denied, we give great deference to the decision denying rehearing. See *CAB* v. *State Airlines*, 338 U.S. 572, 581-582 (1950); *RSR Corp.* v. *FTC*, *supra.*

As to the guidelines, the opponents had the opportunity to make written submissions. Furthermore, the guidelines were merely conditions of approval permitted by 310 Code Mass. Regs. 7.02 (2)(c) (1979) to protect the public health. They were based on the record developed at the adjudicatory hearing. We defer, here, to the agency's application of the regulation. See *School Comm. of Boston* v. *Board of Educ.*, 363 Mass. 125, 129 (1973).

Likewise, the opponents are not entitled to a rehearing merely because the plan approved by the DEQE differed from that originally submitted. Had the plan approved differed so radically from the original that the opponents were, in fact, deprived of the opportunity to argue against it, their due process rights might have been violated. However, the DEQE determined that the revised plan raised no issues that were not subject to the prior hearings. Furthermore, the opponents were afforded, and took advantage of, an opportunity to submit written comments on the final plan. In such circumstances, we will not overrule the agency's determination that a rehearing is not necessary.[15] Cf. *States*

---

[15] The opponents' argument that a rehearing is necessary because the DEQE cannot determine exactly the emission factors of the revised diesel plan likewise must fail. The record indicated to the DEQE that the new

*Marine Lines* v. *FMC,* 376 F.2d 230, 233-234 n.6 (D.C. Cir. 1967); *CAB* v. *State Airlines, Inc., supra* at 580-581.

3. *Burden of proof.* The opponents next argue that their due process rights were violated when the DEQE improperly shifted the burden of proof on the issue of the proportion of NO which could be expected to be converted to the pollutant $NO_2$. Briefly, the Environmental Protection Agency (EPA) has a guideline that calls for the use of an assumption of 100% $NO_x$ to $NO_2$ conversion when using a screening model for determining annual average impact of $NO_2$. That guideline is inapposite to the MATEP hearings, however, because the DEQE was neither utilizing a screening model nor applying the estimate of conversion to an annual average.

We are convinced that the DEQE did not abuse its discretion by determining that, for the purposes of the MATEP plant, an 81% conversion of $NO_x$ to $NO_2$ would be utilized. The record shows that the 81% figure was the *highest* proportion introduced by any of the technical experts who testified. We leave it to the DEQE to make this determination, especially as it is so clearly within the ambit of its expertise. See *School Comm. of Boston* v. *Board of Educ.,* 363 Mass. 125, 128 (1973); G. L. c. 30A, § 14. We hold that the 81% figure is supported by substantial evidence and shall not be disturbed. Cf. *Raytheon Co.* v. *Director of the Div. of Employment Sec.,* 364 Mass. 593, 595-596 (1974).

Assuming, arguendo, that MATEP must carry the burden of proving the facility is not a health hazard, that burden was not shifted to the opponents. Rather, voluminous evidence was introduced tending to show that the proportion should be no greater than 81%. By asking the opponents if they had any evidence rebutting the 81% figure, the DEQE did not shift the burden of proof. Rather, it was merely at-

plan would fall within the boundaries devised to protect the public health and that postconstruction testing and modification pursuant to 310 Code Mass. Regs. 7.02 (2)(c) (1979) would assure the accuracy of this determination. Once again we bow to the expertise of the DEQE in this matter.

387 Mass. 372                                                387

Brookline *v.* Commissioner of the Department of Environmental Quality Engineering.

tempting to acquire as much evidence as possible on the issue before making a determination.

4. *Hot spots.* The opponents next argue that the DEQE finding that MATEP's emissions would not harm public health at numerous "hot spots"[16] is unsupported by substantial evidence and is arbitrary and capricious. In particular, Brookline points to five errors.

A. *Disregard of the DEQE's guideline.* In the final decision of May 27, 1980, disapproving MATEP's diesel plan, the DEQE found that MATEP had not provided for sufficient reduction in diesel emissions when they were causing or contributing to levels of $NO_2$ above 320 ug/m$^3$ at hot spots. The DEQE promulgated a guideline[17] that MATEP would have to satisfy in order to gain DEQE approval. In the reopened hearing that followed, it was shown that MATEP could not satisfy the guideline. Based on evidence given by a DEQE staff member, the DEQE developed a new guideline[18] for reviewing the MATEP plan.

Brookline's opposition to the revised guideline stems principally from the testimony of the DEQE staff employee who proposed the revised standard. He stated that, since motor

---

[16] A "hot spot" is a relatively small, highly-trafficked location. The DEQE identified more than twenty-six such areas that might be affected by the MATEP facility.

[17] The guideline required: (a) reduction of MATEP's diesel operations at all times when MATEP emissions would cause or contribute to $NO_2$ levels at any hot spot above 320 ug/m$^3$, and (b) assurances that, when diesel operations are reduced, the limited $NO_x$ emissions will not have a significant impact at any hot spot, which would cause or contribute to levels above 320 ug/m$^3$.

[18] The guideline, set forth in the November 24, 1980, decision, provided as follows: "In order for a major new source of $NO_x$ to comply with DEQE's policy, it must meet certain requirements. Initially, the source must demonstrate to the satisfaction of the Department that it has installed the Best Available Control Technology for the reduction of $NO_x$ emissions. Secondly, it must be shown that the proposed source will not have a significant net impact on any potential hot spot at times when the total hourly $NO_2$ concentration at such hot spot is above 320 ug/m$^3$ on more than one day per calendar year. This demonstration must be made at a representative number of potential hot spots within the zone of influence of the proposed source."

vehicle $NO_x$ emissions, the primary source of $NO_2$ at hot spots, would be expected to decrease in future years, it would not unreasonably jeopardize public health to allow MATEP to cause a significant impact on $NO_2$ levels exceeding 320 ug/m$^3$ at hot spots one day a year. Brookline argues that, in fact, the evidence tends to show that $NO_2$ levels will increase in future years, despite automobile emission control programs. Thus, continues Brookline, the revised DEQE guideline is not based on the evidence and is arbitrary and capricious. We disagree.

We note first that the declared rationale for the revised guideline was that it was "based upon the most recent method used by the Environmental Protection Agency (EPA) to set short-term air quality standards." (The EPA had revised its one-hour ozone standard to allow more than one hourly exceedance a year if all exceedances occur on the same day.) The final decision adopting the revised guideline found this standard to be reasonable, and we will not disturb this finding, based, as it is, on the agency's expertise. We hold that the use of identical limits by the EPA and the DEQE in their ambient air quality standards for ozone (40 C.F.R. § 50.9 [1981]; 310 Code Mass. Regs. 6.04 [4][1980]), a pollutant more toxic than $NO_2$, is "such evidence as a reasonable mind might accept as adequate to support a conclusion." G. L. c. 30A, § 1 (6), inserted by St. 1954, c. 681, § 1. *Katz* v. *Massachusetts Comm'n Against Discrimination*, 365 Mass. 357, 365 (1974).

Secondly, there appears to be a difference of opinion on the likelihood of the reduction in automobile $NO_x$ emissions. Even if we disagree with the DEQE's projection of a reduction of such emissions, there is sufficient evidence in the record supporting the agency's view so that we will not disturb it. "A court may not displace an administrative board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Labor Relations Comm'n* v. *University Hosp.*, 359 Mass. 516, 521 (1971).

B. *Suppression of evidence.* Brookline next argues that certain documentary evidence relating to the identification of hot spots was suppressed by the DEQE in its November 24, 1980, final decision and that, therefore, the exclusion of two areas from the list of hot spots was arbitrary and capricious. We disagree.

The DEQE set certain standards of $NO_2$ levels at hot spots which, if exceeded, would compel MATEP to reduce diesel emissions. The ability to reduce satisfactorily such emissions was a prerequisite to approval of the MATEP diesel facility. Thus, the DEQE had to identify potential hot spots for monitoring purposes. Brookline urged that two areas, Cleveland Circle and the intersection of Washington and Beacon Streets, be included in the list of hot spots.

Extensive evidence was taken on the criteria which should be utilized in the identification of hot spots. Much of this evidence supports Brookline's view. However, there was also evidence pointing to the exclusion of the two areas from the list of hot spots. That some of this evidence may have been hearsay is not, of itself, ground for objection. G. L. c. 30A, § 11 (2). 310 Code Mass. Regs. 1.01 (10)(g) par. 2 (1979). See *Goodridge* v. *Director of the Div. of Employment Sec.,* 375 Mass. 434, 436-437 & n.2 (1978). We have carefully reviewed the November 24, 1980, final decision which excluded the two areas from the list of hot spots and find the determination to be supported by substantial evidence. In particular, the documentary evidence which Brookline claims was suppressed was considered at length. If we were to determine the issue de novo, we would find it a close question. This matter is not, however, before us de novo, and, because the evidence supporting the DEQE's decision is substantial, we decline to disturb it. See *Labor Relations Comm'n* v. *University Hosp., supra*; *Katz* v. *Massachusetts Comm'n Against Discrimination, supra.*

C. *Significance of MATEP's impacts on hot spots.* The DEQE's guidelines for hot spots included an element providing that, when $NO_2$ levels at a hot spot exceed 320 $ug/m^3$, MATEP must reduce its diesel operation to such a

level that the $NO_x$ emissions "will not contribute significant amounts of $NO_2$ to any hot spot with pre-existing high ambient $NO_2$ levels." At issue here is the determination of what $NO_2$ impacts should be considered insignificant.[19]

The opponents argue that the level of significance should be set at 1% of the $NO_2$ limit, or 3.2 ug/m$^3$. They derive this figure from EPA's conclusion that, in areas not attaining the annual $NO_2$ standard of 100 ug/m$^3$, new source impacts of less than 1 ug/m$^3$ are insignificant. The DEQE rejected the 1% figure and adopted, instead, a level of net[20] MATEP $NO_2$ impacts of less than 32 ug/m$^3$ (10%) as insignificant. In the final decision the DEQE discussed at length its rationale for choosing the 32 ug/m$^3$ figure. In giving "due weight to the experience, technical competence, and specialized knowledge of the agency," G. L. c. 30A, § 14, as amended through St. 1976, c. 411, §§ 1, 2, we hold that the DEQE decision in this respect is supported by substantial evidence and will not be disturbed.

D. *Method of accounting for missing hours.* As discussed above, approval of the diesel facility was based in part on assurance that MATEP would not be expected to contribute a significant impact to one-hour $NO_2$ levels in excess of 320 ug/m$^3$ at any particular hot spot location on more than one day a year. Such assurances were based on a comparison of actual data as to $NO_2$ levels with a computer model of the potential impact by the MATEP diesel facility.

Since the device monitoring $NO_2$ was not operating continuously, the data upon which the DEQE relied accounted for only 48% of all the hours over the data base period from November, 1973, to August, 1979. Brookline argues, consistent with an EPA formula, that the missing hours should

---

[19] All parties agree that insignificant MATEP impacts at hot spots may be disregarded.

[20] The net figure credits MATEP with the reduction of $NO_2$ at hot spots which can be attributed to the retiring of another generating plant replaced by MATEP. We find no fault with such crediting nor with crediting MATEP with the actual reduction in $NO_2$ levels, even if such reduction is less than 32 ug/m$^3$.

be assumed to be above the limitation in the same proportion as those hours for which actual data are known. The DEQE rejected this suggestion because it did not take into account the seasonal nature of $NO_2$ pollution.[21] Instead, the decision adopts a method in which seasonal factors are weighed. Using this method, the DEQE found that MATEP would have less than one significant net impact in a calendar year at hot spot locations, even when the missing data are considered. We hold that this finding is substantially supported by the evidence and is not arbitrary or capricious.

E. *Trigger mechanism at Route 9 hot spot.* In response to a recognition that the MATEP diesel facility will, under normal operating procedures, cause or contribute to $NO_2$ levels above 320 ug/m$^3$ at certain times, MATEP's plan, accepted by the DEQE, provides for a $NO_2$ monitor at one of those locations (Route 9) with a trigger mechanism to activate reduction in diesel operation when 250 ug/m$^3$ is reached and the wind is blowing from the facility toward Route 9. Brookline argues that the trigger mechanism will be ineffective in performing its intended function. We have reviewed the evidence and hold that there is substantial support in the record for the DEQE determination that the trigger mechanism would operate to reduce MATEP's $NO_x$ impacts at hot spots sufficiently to protect public health.

Brookline argues further that the trigger system, an intermittent control of pollution, is impermissible as opposed to a permanent control. The EPA has determined that, in meeting Federal air quality requirements, new sources such as MATEP may not utilize intermittent controls.[22] Brookline presented in its brief some evidence that such intermittent controls are unreliable and difficult to enforce.

---

[21] The DEQE found that the "overwhelming majority" of days on which $NO_2$ exceeds 320 ug/m$^3$ occur in the months of May through October.

[22] See Legal Interpretation and Guidelines Concerning Stack Height Increases as a Means of Meeting Federal Ambient Air Quality Standards, Environmental Protection Agency Guidelines Series OAQPA No. 3.0-003 (Jan. 6, 1976).

We note, however, that the trigger mechanism was approved by the DEQE to help enforce its State one-hour $NO_2$ limit of 320 ug/$m^3$. This is a more stringent limit than that imposed by Federal regulations. In such circumstances, the DEQE is qualified to determine its own methods of enforcement.

5. *Tentative decision.* The adjudicatory hearing on the hot spots issue held from September 16 through September 19, 1980, was jointly conducted by Ellyn Weiss, who had been the hearing officer at the prior hearings, and by DEQE Deputy Commissioner Fierra. Following the hearing, Fierra wrote and issued a final decision without Weiss's issuing a tentative decision. The Brookline opponents claim that this procedure violated their due process rights because it did not follow the procedure delineated in Rules 38 and 40 of the Rules of Procedure applicable to the MATEP proceeding.[23] Rule 38 provides in part: "Unless required or authorized by statute to render a final decision, a hearing examiner who has heard a matter shall propose a tentative decision for the Department's consideration in every case where there is no statutory provision for an opportunity for an appeal hearing." Rule 40 provides that a tentative decision is subject to comment by all parties. Since Weiss, continue the Brookline opponents, was the hearing officer, and was not authorized to render a final decision, it was error for Fierra to issue his final decision absent a tentative decision by Weiss.

We believe that the purpose of rules 38 and 40 is not to require a tentative decision in the circumstances of this case. When the decisionmaker officiates at the hearing, even if accompanied by a person designated as hearing officer, it serves no purpose to insist on a tentative decision. Rather, it is when the decisionmaker is absent from the hearing that a tentative decision which identifies issues and resolves questions of credibility is useful.

---

[23] These are rules promulgated by the Department of Public Health.

We note that Rule 19 (2) of the Rules of Procedure promulgated by the Department of Public Health supports our conclusion. That rule provides that at the close of a hearing "a hearing examiner sitting as a sole adjudicatory official shall only propose a tentative decision for the consideration of the Department." We understand this rule to imply that when a decisionmaker sits at an adjudicatory hearing, no tentative decision is necessary. Cf. G. L. c. 30A, § 11 (7), inserted by St. 1954, c. 681, § 1 (requiring a tentative decision with opportunity for comment only "[i]f a majority of the officials of the agency who are to render the final decision have neither heard nor read the evidence").

We hold that the due process rights of the opponents were not violated by the failure of the DEQE to require a tentative decision in this case.

6. *Other objections.* We have examined the other issues raised by the Mission Hill opponent. Most of them concern the sufficiency of evidence upon which the DEQE based its decision. We hold there was sufficient evidence. Further, that a piece of equipment was approved for use in MATEP when such approval was not sought is harmless error, especially when the mistake was corrected in a later decision. Other Mission Hill objections are not relevant to the issues before this court.

*Conclusion.* This case is to be remanded by the Superior Court to the DEQE for a determination of the potential adverse health effects of the carcinogenic and mutagenic emissions from the MATEP diesel facility. All other aspects of the DEQE decision are to be affirmed.

*So ordered.*