BARNSTABLE COUNTY RETIREMENT BOARD *VS.* CONTRIBUTORY RETIREMENT APPEAL BOARD & another.[1]

No. 96-P-414.

Barnstable. April 17, 1997. - August 12, 1997.

Present: PORADA, IRELAND, & GREENBERG, JJ.

*Administrative Law,* Judicial review, Substantial evidence, Agency's interpretation of statute. *Public Employment,* Retirement. *Contributory Retirement Appeal Board.*

A decision of the Contributory Retirement Appeal Board, affirming a directive of the Public Employee Retirement Administration (PERA) prohibiting a retirement board from accounting for refunded investment management administrative fees, and interest thereon, as a return on investment, was not shown to be arbitrary or capricious; further, the decision was consistent with PERA's statutory duty to establish uniform and reasonable benchmarks for measuring individual retirement boards' return on investments. [344-347]

A directive of the Public Employee Retirement Administration (PERA) to a retirement board with respect to its accounting for refunds of uninvested principal did not amount to an exercise of discretionary authority respecting the management and control of pension funds. [347]

CIVIL ACTION commenced in the Superior Court Department on April 21, 1994.

The case was heard by *Gerald F. O'Neill, Jr.,* J.

*Rosemary S. Gale,* Assistant Attorney General, for the defendants.

*Thomas J. Perrino* for the plaintiff.

IRELAND, J. The parties dispute the method by which certain management fees that have been refunded by an investment management company to the Barnstable County retirement board (board) should be accounted for and recorded in the board's books. The board contends that the refunds, which represent a portion of the total amount of management fees that

[1]Public Employee Retirement Administration.

the board paid to an investment management company, should be logged in its books as investment income to show a net positive return on the investment funds that the company handled for the board. The defendants, the Contributory Retirement Appeal Board (CRAB) and the Public Employee Retirement Administration (PERA), contend otherwise. According to them, the refunded management fees are just that: uninvested money that was paid back to the board, dollar for dollar, by the investment management company for the board's overpayment of management fees. In other words, the board did not, according to CRAB and PERA, actually *make* money on that portion of its funds; it merely received a refund of its own uninvested principal.

The amount in this particular case is small: $27,000 in refunds received by the board in 1991 for management fees that it paid to the company in 1987, plus $11,000 in interest on those fees. But we are told that the stakes are actually much higher. Significantly greater refunds from that particular company, totaling well over $1,500,000, are also in the pipeline. In addition, some twenty other local retirement boards have had their investment funds managed by that company, and they, too, are due to receive, or have already received substantial refunds of management fees. CRAB and PERA further point out that the various retirement boards around the Commonwealth are rated by PERA according to their individual performances in investing their members' pension funds. Allowing the board to show as investment income or a return on investment fees that have been refunded to it, according to CRAB and PERA, would throw PERA's rating system into disarray by distorting the board's performance.

PERA's and CRAB's position in this controversy is memorialized in CRAB's administrative decision of March 21, 1994, which the board appealed to the Superior Court pursuant to the State Administrative Procedure Act, G. L. c. 30A, § 14. In a memorandum of decision, a Superior Court judge reasoned that the refunded management fees "can be characterized as a penalty, or a make good [by the investment management company]"; but that, however characterized, the refunds were the result of the board's initial decision to invest with the company and should, therefore, show up as a return on that investment. The judge reversed CRAB's decision and entered judgment in the board's favor that the total amount of the refund

was, in fact, a return on the board's investment with the company.

We affirm CRAB's decision and, in so doing, reverse the judgment of the Superior Court. Refusal to allow the board to include refunded administrative fees and interest thereon as a return or yield on the board's investments was not arbitrary or capricious within the meaning of the State Administrative Procedure Act, G. L. c. 30A, § 14, and was consistent with PERA's over-all statutory responsibility to prescribe reasonable and uniform benchmarks for measuring individual retirement boards' returns on their invested pension funds.

*Factual background.* Beginning in about 1986, the board retained Aetna Life Insurance Company (Aetna) to manage a significant portion of the board's pension funds. The board paid Aetna management fees representing a percentage of the total amount of pension funds that Aetna was going to handle. The management fees were paid out of the board's investment income account. Aetna, in turn, redirected portions of the management fees in the form of commissions to one Carmen Elio and various investment companies controlled by Elio. When the matter of such "split" commissions and Elio's investment activities in general came under the scrutiny of the Attorney General and the United States Attorney, Aetna, although it admitted no wrongdoing, agreed in September, 1991, to refund to the board (and to other retirement boards) a portion of its management fees as "an accommodation" and "to avoid even the appearance of impropriety."

Aetna's first refund to the board in 1991 was for $38,000 ($27,000 for management fees paid for 1987, plus $11,000 interest, more or less, on those fees). That payment was followed in 1992 by another payment to the board of $1,117,000, and in 1993, by a third payment of $586,276. Like the first payment, the 1992 and 1993 payments included a substantial amount in interest.[2]

In February, 1992, acting pursuant to its authority under G. L. c. 32, § 21(1)(a), as appearing in St. 1982, c. 630, § 25, to "prescribe and supervise methods of accounting and record-keeping" for the Commonwealth's public retirement systems, PERA issued a memorandum to all local retirement systems

---

[2]While only the 1991 payment is before us, our decision will obviously affect the proper accounting of the 1992 and 1993 payments.

that had received refunds from Aetna, including the board, instructing them that the refunds were to be regarded as a miscellaneous cash receipt and should be logged according to PERA's accounting manual as, "Investment income received, reimbursement of management fees." PERA's memorandum further instructed that, while the refunded money could be restored to the board's investment income account from which it had originally been paid, the money should *not* be counted in the board's books or in its annual report to investors as a return on invested pension funds.

The board asked PERA to reconsider its decision to exclude the refunds from the calculation of its return on investment. PERA declined, but it did tell the board that the 1991 PERA investment report would include a special notation that the investment return records did *not* include Aetna's refunds of management fees. Pursuant to G. L. c. 32, § 16(4), the board sought review by CRAB of PERA's decision. CRAB assigned the matter to an administrative magistrate from the Division of Administrative Law Appeals (DALA) who, after a hearing, ruled in favor of the board. Specifically, the magistrate found that PERA's decision was arbitrary and inconsistent with its prior and subsequent interpretation of its own rules and regulations. The magistrate also found that PERA's instructions to the board on how it should account for the refunds amounted to an exercise of discretionary authority by PERA respecting the management and control of pension funds, thus making PERA a fiduciary of the board and potentially liable to it for any investment losses.

In its final administrative decision on the matter, CRAB reversed several of the magistrate's rulings, including the one that PERA had acted as a fiduciary. More important, CRAB affirmed PERA's original ruling that the refunded management fees that the board received in 1991 were not the result of investment activity by the board in that year and, therefore, could not be treated as a return on investment. The Superior Court judge, in turn, vacated CRAB's decision as arbitrary and capricious and reinstated the magistrate's decision in favor of the board.

*Discussion.* Under G. L. c. 30A, § 14(7), a reviewing court may set aside the agency's decision if the decision is unsupported by substantial evidence, or is arbitrary, capricious, or "not in accordance with law." See *Retire-*

*ment Bd. of Somerville* v. *Contributory Retirement Appeal Bd.,* 38 Mass. App. Ct. 673, 676-677 (1995). When reviewing an agency decision, a court "must give 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.' " *Howard Johnson Co.* v. *Alcoholic Bevs. Control Commn.,* 24 Mass. App. Ct. 487, 492 (1987), quoting from G. L. c. 30A, § 14(7). An agency such as PERA "has considerable leeway in interpreting a statute it is charged with enforcing." *Martinez* v. *Commissioner of Pub. Welfare,* 397 Mass. 386, 392 (1986) quoting from *Grocery Mfrs. of Am., Inc.* v. *Department of Pub. Health,* 379 Mass. 70, 75 (1979).

PERA is charged by statute with over-all responsibility to administer the public employee retirement system. For example, PERA is given authority under G. L. c. 7, § 50(*a*), as inserted by St. 1982, c. 630, § 2, to "promulgat[e] rules and regulations governing administrative procedures, financial operations, [and] records and reports of the retirement boards . . . ." As part of its over-all statutory duty to establish benchmarks for measuring individual retirement boards' return on their investments, PERA produces an annual report in which individual boards are ranked against each other. See G. L. c. 32, § 21(6)(*c*).

An agency such as PERA may ordinarily elect to carry out its statutorily delegated duties either by promulgating rules and regulations, or it may proceed, as in this case, through individualized determinations. *Massachusetts Elec. Co.* v. *Department of Pub. Util.,* 383 Mass. 675, 679-680 (1981). PERA's exercise of its oversight and administrative responsibilities is not confined by statute to rule making. See G. L. c. 7, § 50; G. L. c. 32, § 21(4) (PERA must promulgate rules and regulations only when it deems necessary).

PERA has formulated no precise rule or regulation to deal with this unusual situation. Nor has PERA previously adjudicated the question here presented. Apparently, PERA's accounting manual contains no specific method as to how these refunds should be accounted for. When it instructed the board on how to proceed, PERA improvised the designation "reimbursement of management fees," and also agreed to add a special notation to its 1991 report concerning the refunds by Aetna. In effect, the board accuses PERA of making it up as it went along — and of issuing rulings contradictory to or inconsistent with PERA's own prior practices. The board points out, for instance, that

PERA considers the receipt by an individual retirement board of legislatively appropriated money pursuant to G. L. c. 32, § 22(8), in the form of an incentive or bonus for that board's decision to invest its pension funds in the State-created Pension Reserve Investment Trust (PRIT), to be a return on that board's investment in PRIT. A PRIT bonus, according to PERA, is the direct result of a board's investment decision and, so, is properly countable as investment income.

The board also points to a letter it received in 1992 from PERA's commissioner which states that the interest paid to the board pursuant to G. L. c. 35, § 24, by one of the board's late-paying governmental unit members could be placed in the board's investment income account. The commissioner's rationale was that the interest, which he characterized as a "penalty," was intended "to compensate the [board] for lost investment income."

These two examples, the board implies, point toward agency precedent that *any* income or cash payment an individual board receives as the result of an investment decision is countable as a return or yield on investment. In the eyes of the board, PERA's and CRAB's current position amounts to an unexplained departure from PERA's precedent for which there is due a more convincing statement of reasons explaining why the board's situation has been treated differently. See generally 2 Davis, Administrative Law § 11.5 (3d ed. 1994); Cella, Administrative Law and Practice § 422 (1986).

As to PERA's 1992 response to the board's inquiry concerning allocation of interest received pursuant to G. L. c. 35, § 24, a single, two sentence letter from PERA's commissioner hardly constitutes the sort of formal agency decision making that adds up to agency precedent. Contrast *Boston Gas Co.* v. *Department of Pub. Util.*, 367 Mass. 92, 103-104 & n.5 (1975), where inconsistent orders entered on the same issue in numerous formal agency adjudications over a period of several years prompted the reviewing court to vacate the agency's decision and to remand the matter to the agency for a statement of reasons for its decision. More important, however, the commissioner's letter merely advises the board as to which account the "penalty" should be credited. The letter says nothing about actually counting the penalty as a return on the board's investment.

In addition, PERA's position on PRIT bonuses is not at odds

with its position on the unanticipated refund of administrative fees that were never actually available for investment. A PRIT bonus, which follows directly on the heels of an investment decision, appears calculated as an incentive that yields an immediate return on a participating board's investment and, so, is properly counted as such. By contrast, money refunded to the board — while arguably the indirect result of its initial decision to invest with Aetna — was never invested and, therefore, could not show up now on the board's books as a return on investment. The money was simply paid out to Aetna by the board as a fee for service. Amounts paid out as overhead expenses including, as here, the purchase of professional services and amounts categorized as invested capital are well understood accounting distinctions.

PERA is given authority under statute to tell individual retirement boards how to account for cash receipts, so as to achieve uniformity and comparability of investment results. Unless they are manifestly unreasonable, PERA's directives should be adhered to in order to put all of the State's public retirement boards on the same footing and to allow for ready comparisons of investment results. We will not second guess PERA's directives, even if they are susceptible of reasonable debate — particularly where the directive here in question is to be applied even-handedly to all boards affected by Aetna refunds.

We turn, finally, to PERA's and CRAB's remaining claim on appeal: that when PERA instructed the board as it did, it did not act as a fiduciary to the board within the meaning of G. L. c. 32, § 1.[3] We agree. PERA did not exercise discretionary authority over the board as to how the board should manage, invest, or dispose of its pension funds. PERA acted in a ministerial capacity pursuant to its statutory responsibility to establish uniform accounting and record keeping procedures. Stated another way, PERA simply instructed the board on how the refunds from Aetna should be treated for accounting purposes. The relationship between PERA and the board was not fiduciary in nature.

---

[3]The relevant provision of G. L. c. 32, § 1, as inserted by St. 1976, c. 269, § 1, reads: " 'Fiduciary,' any person who exercises any discretionary authority or discretionary control respecting management of the funds of any retirement system or exercises any authority or control respecting management or disposition of its assets."

The judgment of the Superior Court is reversed, and a new judgment is to be entered affirming the decision of the Contributory Retirement Appeal Board.

*So ordered.*